1  **SCOTT C. CLARKSON, ESQ.** SBN 143271
   **EVE A. MARSELLA, ESQ.** SBN 165797
2  **CHRISTINE M. FITZGERALD, ESQ.** SBN 259014
   **CLARKSON, GORE & MARSELLA**
3  **A PROFESSIONAL LAW CORPORATION**
   **3424 Carson Street, Suite 350**
4  **Torrance, California 90503**
   **(310) 542-0111 Telephone**
5  **(310) 214-7254 Facsimile**
6
7  [Proposed] Attorneys for ConnectTo Communications,
   Inc. Chapter 11 Debtor and Debtor in Possession
8
9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA,**

11                  **LOS ANGELES DIVISION**

12  | In Re | Case No.  2:10-bk-19227-VZ |

13  **ConnectTo Communications, Inc.**          Chapter 11
            **a Nevada corporation,**

14                                      **DEBTOR'S EMERGENCY MOTION FOR**
                                        **APPROVAL FOR INTERIM USE OF CASH**
15          Debtor and Debtor in         **COLLATERAL [FOR THE PERIOD MARCH**
            Possession.                  **12, 2010 THROUGH SEPTEMBER 30, 2010];**
16                                       **DECLARATION OF ARAKSIYA**
                                         **NADJARIAN IN SUPPORT THEREOF**
17
18                                       Date:   TBD
                                         Time:   TBD
19                                       Ctrm:   1368

20      **TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES**

21  **BANKRUPTCY JUDGE, SECURED CREDITORS, CREDITORS HOLDING THE**

22  **TWENTY LARGEST UNSECURED CLAIMS, AND THE OFFICE OF THE UNITED**

23  **STATES TRUSTEE:**

24          ConnectTo Communications Inc., chapter 11 Debtor and Debtor in Possession herein (the

25  "Debtor"), pursuant to Local Bankruptcy Rule 2081-1, hereby moves the Court for entry of an

26  order authorizing the Debtor to use Cash Collateral for the period of March 12, 2010 through

27  September 30, 2010 (the "Motion").

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

### A.    Background

On March 12, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is a Nevada corporation.  The Debtor's corporate headquarters are located at 555 Riverdale Drive, Suite A, Glendale, CA 91204.  Under 11 U.S.C. §§ 1107 and 1108, the Debtor has remained in possession of all of its assets and continues to operate and manage its business as a debtor-in-possession during the pendency of the Chapter 11 case.  The Debtor previously filed a voluntary Chapter 11 bankruptcy petition on November 30, 2009, Case No.2:09-bk-43560-VZ.  Due to the mis-begotten efforts of a non-bankruptcy practicing attorney, the earlier case was soon thereafter converted to a Chapter 7 on January 25, 2010, and was dismissed on March 12, 2010.  That case was in shambles, and required a professional's hand in the adequate preparation and submission of proper schedules, the SOFA, the UST reports and Motions to effectuate a chapter 11 reorganization.  After the hearing date on the dismissal of the chapter 7 case, the Debtor obtained counsel with instructions to seek an out-of-court workout with AT&T, the Debtor's largest unsecured creditor and service provider.  The new counsel sought out AT&T; however, AT&T instructed its counsel not to engage the Debtor in any efforts to work-out a settlement.  Thus, upon the dismissal of the Chapter 7 case, the Debtor properly filed its chapter 11 petition.

### B.    Description of the Debtor's Business

The Debtor incorporated in the state of Nevada on May 19, 2004 and is registered to do business in the state of California.  The Debtor is a telecommunications company and services approximately 20,000 customers by reselling local telecommunications service purchased in bulk from Pacific Bell Telephone Company, doing business as AT&T California, and from Verizon.  The Debtor also provides long distance and ISP services.  **Approximately 80% of the Debtor's customers are low income U.S. residents who, on a daily basis, rely on the**

1  **Debtor**.  The service the Debtor provides to its low income customers is significantly

2  subsidized by the California Public Utilities Commission (PUC).  As a result of the failure of

3  the CA PUC to timely provide the promised payments on subsidies, the Debtor fell behind on

4  its payment to AT&T.  At this time, the PUC owes the Debtor approximately $900,000.00, and

5  between $300,000 and $600,000 is expected to be paid by the PUC in the next 90 to 120 days.

6        **i.**       **Immediate and Projected Financial Position of the Debtor**

7        Simply put, the Debtor is able to begin this chapter 11 case with the ability of operating

8  its company as a going concern with the present monthly income it now generates, and to pay

9  all adequate protection amounts necessary to ensure that operational administrative claims do

10  not accrue.

11        For its Motion for Use of Cash Collateral, the Debtor presents to the Court and all

12  interested parties projections of revenues and operating results for the next six months (the

13  "Budget") (attached hereto and incorporated herein as **Exhibit "A"**).  The Debtor also provides

14  its unaudited profit and loss statement for 2009 and for the months of January 2010 to March 2,

15  2010 (attached hereto and incorporated herein as **Exhibit "B"**).  The Budget, prepared by the

16  Debtor's CEO, is based on historical results prior the pendency of the previous Chapter 11 case.

17        At the time of the filing of the case, the Debtor had approximately $14,060.73 cash on

18  hand and monthly operational accounts receivables of approximately $241,221.74. In addition,

19  another $938,000 is owed to the Debtor by the PUC for payment subsidies arising from 2008

20  (the "Open Implementation Claim") and 2009 "Reimbursement for Low Income Customers".

21  These funds are also encumbered by the two primary secured creditors of the Debtor, Wells

22  Fargo Bank and Wilshire State Bank.  Further, these PUC amounts are not included in the

23  operational income budget provided, as they are unnecessary for the day-to-day operations of

24  this Debtor at this time. These PCU funds, which are expected to be paid throughout 2010, will

25  be the foundation for the Plan of Reorganization of the Debtor.

26        The Budget indicates that the Debtor's estimated income for the remainder of March

27  2010 is $174,170.00, $317,170.00 for April, $323,170.00 for May, $329,170.00 for June,

28

1 $364,170.00 for July, $370,170.00 for August, and $376,170.00 for September. After all

2 proposed paid expenses, for March, 2010, the Debtor will have $16,027.58 cash on hand,

3 $11,330.52 for April, $12,633.46 for May, $14,936.40 for June, $47,239.34 for July, $85,542.28

4 for August, and $129,845.22 for September.  The Debtor anticipates continuing cash flow

5 sufficient to meet all of its immediate post-petition ordinary and necessary operating expenses

6 (including secured creditor payments to provide adequate assurance) during the next six

7 months. The profit and loss statement, and the Declaration of Araksiya Nadjarian, demonstrate

8 that the Budget is realistic and accurate.

9       The Debtor's CEO utilized the Debtor's Profit and Loss Statements from May 2009 to

10 October 2009, to project the anticipated sales for March 2010 through September 2010.  The

11 Debtor projects that its customer payments will continue to increase based on the historical

12 increase of customer payments.  Further, as the Debtor's business increases the Debtor's USAC

13 reimbursement and CABS invoices will increase as well.  Finally, the Debtor anticipates a

14 reimbursement from the Public Utilities Commission around July of 2010 for claims submitted

15 after March of 2010.  **This amount may vary as low as approximately $30,000.00 (as**

16 **reflected in the budget) or as high as approximately $90,000.00.**

17 **C.**      **Relationship with Wells Fargo Bank, N.A. and Wilshire State Bank, and Terms of**

18        **Proposed Cash Collateral Order**

19       The Debtor believes that as of the Petition Date, Wells Fargo Bank, N.A. ("WFB") may

20 be the holder of a secured pre-petition claim against the Debtor in the amount of approximately

21 $99,000.00 (hereinafter referred to as the "WFB Claim"). The Debtor further believes that WFB

22 may have a fully perfected security interest on all of the Debtor's personal property assets,

23 intangibles, and accounts receivables.

24       WFB's secured claim is based on a credit facility between WFB and the Debtor in the

25 amount of $127,100.00 which may be secured by one or more properly filed financing

26 statement with the California Secretary of State, effective upon all of the identified cash,

27 accounts receivables, inventory, equipment, and other personal property items (collectively

28

1    referred to as the "Collateral" or "Cash Collateral").  While reserving its rights, the Debtor has

2    requested to use Cash Collateral in accordance with the terms and conditions set forth herein.

3        The Debtor also believes that as of the Petition Date, Wilshire State Bank ("Wilshire")

4    may be the holder of a secured pre-petition claim against the Debtor in the amount of

5    approximately $688,000.00 (hereinafter referred to as the "Wilshire Claim"). The Debtor further

6    believes that Wilshire may have a fully perfected security interest on all of the Debtor's personal

7    property assets, intangibles, and accounts receivables.

8        Wilshire's secured claim is based on (1) a credit facility between Wilshire and the

9    Debtor in the amount of $800,000.00 (of which $688,000 is owed) which may be secured by

10    one or more properly filed financing statement with the California Secretary of State, effective

11    upon all of the identified cash, accounts receivables, inventory, equipment, and other personal

12    property items (collectively referred to as the "Collateral" or "Cash Collateral").  While

13    reserving its rights, the Debtor has requested to use Cash Collateral in accordance with the

14    terms and conditions set forth herein.

15        Specifically, all cash or cash equivalents currently held by the Debtor, or that may come

16    into the Debtor's possession, may be "Cash Collateral" as that term is defined in 11 U.S.C. §

17    363(a), but  subject to future review and analysis by the Debtor.  Thus, the Debtor believes that

18    WFB and Wilshire may be entitled to the benefits of § 506(b) of the Bankruptcy Code by virtue

19    of their presumed perfected security interests in the Collateral, and that WFB and Wilshire have

20    a presumptive interest in "Cash Collateral" within the meaning of 11 U.S.C. § 363(b).

21        For purposes of this Motion only, the Debtor assumes that any cash or cash equivalents

22    (or other proceeds) received by the Debtor after the Petition Date presumptively constitute

23    proceeds of the Collateral and are, therefore, part of WFB and Wilshire's Cash Collateral within

24    the meaning of 11 U.S.C. § 363(a) to the extent that WFB and Wilshire are later determined to

25    hold a valid and perfected lien against the assets of the Debtor based on recorded UCC-1's.

26        In order to operate its business and be able to fund a plan of reorganization, because of

27    the interests, claims, liens and/or encumbrances which may be held by WFB and Wilshire, and

28

1    because of the Debtor's need to use Cash Collateral to fund the ordinary and necessary expenses

2    of operating its business, the Debtor seeks approval to allow the Debtor's interim use of Cash

3    Collateral for an initial period commencing March 12, 2010 through September 30, 2010 (the

4    "Interim Period"), and requests a hearing in late September, 2010, for further use of Cash

5    Collateral.

6        Under the terms of the proposed authorization which the Debtor is seeking, the Debtor

7    would be authorized to use the Cash Collateral in accordance with the Budget and the terms of

8    an interim Order to be crafted by this Court and the Debtor.  It is proposed that the Debtor's use

9    of Cash Collateral shall be expressly limited to the categories set forth in the Budget (**Exhibit**

10   **"A"**) and no budget line item shall be available for the payment of any other line item or

11   expense or for any other purpose whatsoever unless ordered by the Court or with the prior

12   written consent of WFB and Wilshire for the applicable period.

13       The Debtor also seeks authorization that during the term of the interim Order, the Debtor

14   may exceed the amounts set forth in the Budget (**Exhibit "A"**) by 5% for any line item, per

15   month, without further order of the Court or written consent by WFB and Wilshire.

16   Nevertheless, the Debtor covenants that it will undertake its best efforts to minimize its

17   anticipated expenses, so as to keep the actual monies spent less than the projected amounts

18   under the Budget **Exhibit "A."**

19       During the term of the proposed interim Order, the Debtor proposes to provide to WFB

20   and Wilshire copies of any and all Monthly Operating Reports, including those filed with the

21   Office of the United States Trustee, and to maintain adequate insurance in place in accordance

22   with the insurance requirements of the Office of the United States Trustee.

23       The Debtor further proposes that, except as set forth in the terms of the Order, neither

24   the Debtor, WFB, nor Wilshire will waive or relinquish any of their respective rights, claims,

25   cross-claims, or interests, and shall preserve all of their offsetting rights and/or defenses of any

26   kind or nature that could in any way affect the validity, priority, enforceability, and non-

27   avoidability of the pre-petition indebtedness as between those parties.

28

1    The Debtor is without resources at the present time to operate its business, or to

2    compensate its employees, without the use of the Cash Collateral.  The continued prosecution of

3    this bankruptcy case is critical to maximizing the value of the Estate's assets and achieving the

4    highest recovery for all creditors, including unsecured creditors.

5                                              **II.**

6    **OUTLINE OF THE TERMS OF THE PROPOSED CASH COLLATERAL REQUEST**

7    By this Motion, the Debtor requests to use WFB and Wilshire's Cash Collateral

8    commencing March 12, 2010 and continuing through and including September 30, 2010,

9    pursuant to the Budget (attached hereto as **Exhibit "A").**

10   Pursuant to this Motion, and at the Debtor's request, absent further order or written

11   consent of WFB and Wilshire, the Debtor's actual expenditures shall be expressly limited, on a

12   line-item by line-item basis, to the specific dollar amounts and exclusively for the categories set

13   forth in the Budget, except that the Debtor requests that the Debtor may exceed by 5% the

14   budget for any line item, per month, without further order of the Court or written consent of

15   WFB and Wilshire.

16   The Debtor proposes that in the event an expense arises which is not reflected in the

17   Budget and which in the view of the Debtor is an ordinary business expense or un-ordinary but

18   necessary business expense, the Debtor shall advise WFB and Wilshire three (3) business days

19   beforehand in writing of the nature and amount of the proposed expense Debtor proposes to pay

20   with the use of the Cash Collateral.  If the Debtor does not receive written rejection by WFB

21   and Wilshire for the proposed use from WFB and Wilshire within three (3) business days of the

22   request, the request shall be deemed **accepted** by WFB and Wilshire.  When a request is

23   rejected, the Debtor shall not use Cash Collateral to pay that expense absent a further order of

24   this Court and may present a motion for such an order on an emergency or ex parte basis with

25   notice only to WFB, Wilshire, and the U.S. Trustee, and parties requesting special notice.

26   The Debtor further requests that, except as set forth in the Order, neither the Debtor,

27   WFB, nor Wilshire waive or relinquish any of their respective rights, claims, cross-claims, or

28

1  interests, and shall preserve all of their offsetting rights and/or defences of any kind or nature

2  that could in any way affect the validity, priority, enforceability, and non-avoidability of the

3  pre-petition indebtedness as between the parties, and each of them.

4      The Debtor expressly reserves the right to contest, review, and seek reassessment of the

5  lien claims of WFB and Wilshire.

6      The Debtor also agrees not to make any payments to any "insiders" of the Debtor (as

7  defined in § 101(31) of the Bankruptcy Code), absent filing of notice of Setting Insider

8  Compensation and any other prior compliance with the United States Trustee Guidelines

9  regarding payment of insider compensation.  Further, the Debtor agrees not to sell or otherwise

10  transfer any assets related to or connected with the Collateral outside of the ordinary course of

11  the Debtor's business without any order from the Bankruptcy Court.  Finally, the Debtor also

12  agrees that all income generated by the Debtor shall be placed into the Debtor's Debtor in

13  Possession ("DIP") bank accounts.

14      As and for adequate protection in favor of WFB and Wilshire, the Debtor proposes to

15  provide (and to assure) WFB and Wilshire the following (effective upon the date of the entry of

16  the Order approving this Motion and without the necessity of further execution by the Debtor,

17  or filing of security agreement, pledge agreement, mortgage, financing statements, or

18  otherwise):

19      **(1)** A replacement post-petition lien on a dollar-for-dollar basis in all post-petition

20      assets of Debtor's Estate whether now owned or hereinafter brought into the Estate

21      (excluding any avoidance actions arising under Bankruptcy Code §§ 554, 545, 546, 547,

22      548, 549, 550 or any similar provisions of the Bankruptcy Code) to protect against any

23      diminution in WFB and Wilshire's Cash Collateral or inadequacy of protection;

24      **(2)** The Debtor agrees to maintain insurance as required by the requirements of the

25      Office of the United States Trustee and promptly make all required payments therefore,

26      and comply with all other requirements of law that are necessary to preserve and

27      maintain the value of WFB and Wilshire's and Wilshire's liens and security interests in

28

1    the Collateral;

2    **(3)**  The Debtor shall continue to pay pursuant and subject to the Budget (**Exhibit "A"**)

3    all employment related expenses including but not limited to payroll taxes, benefits, if

4    applicable, and state and federal requirements;

5    **(4)** The Debtor shall make normal interest payments to WFB and Wilshire as set forth in

6    the Budget (**Exhibit "A"**).

7    ### III.

8    ### DEBTOR SHOULD BE ALLOWED TO USE CASE COLLATERAL AS THE

9    ### SECURED CREDITOR IS ADEQUATELY PROTECTED

10    Lenders may assert that the proceeds and other cash equivalents which the Debtor

11    generates from its business operations may constitute cash collateral under 11 U.S.C. §363.  The

12    Debtor has an urgent need to use the cash and cash equivalents generated from its business to

13    continue its business operations.  If the Debtor is not permitted to use the cash and cash

14    equivalents generated from its operations, it will suffer immediate and irreparable harm,

15    including the likely termination of its business.  *See* Declaration of Araksiya Nadjarian attached

16    hereto.

17    11 U.S.C. § 363 allows a trustee or debtor in possession to use "cash collateral" under

18    certain specific circumstances.  "Cash collateral" includes, *inter alia*, cash and cash equivalents

19    in which the estate "and an entity other than the estate" (such as a creditor) has an interest.  11

20    U.S.C. § 363(a).  A debtor may use cash collateral to continue its business operations if each

21    entity having an interest in the cash collateral consents or the court, "after notice and a hearing"

22    authorizes such use.  (11 U.S.C. § 363(c)(2).)  When cash collateral is used by the debtor, the

23    bankruptcy court has the discretion to provide for "adequate protection" to those entities having

24    an interest in the cash collateral.  (11 U.S.C. § 363(e).)  The court may order the granting of

25    replacement liens and may also require that cash payments be made to such entities.  *See, e.g.,*

26    *In re Scottsdale Medical Pavilion*, 159 B.R. 295 (9th Cir. B.A.P. 1993, *In re JKJ Chevrolet,*

27    *Inc.*, 190 B.R. 542 (Bankr. E.D.Va. 1995).

28

1    11 U.S.C. § 363(a) defines "cash collateral" as cash, negotiable instruments, documents,

2    title, securities, deposit accounts, or other cash equivalents whenever acquired in which the

3    estate and an entity other than the estate have an interest.  Cash collateral also includes and

4    proceeds, products, offspring, rents, or profits of property subject to a security interest as

5    provided in § 552(b) of the bankruptcy Code, whether existing before or after the

6    commencement of a case under Title 11.

7    A debtor-in-possession may not use, sell, or lease cash collateral unless each entity that

8    has an interest in such cash collateral consents or the court, after notice and a hearing.  (11

9    U.S.C. § 363(b)(2).)  Pursuant to § 363(e), at any time, on request of any entity that has an

10   interest in property used, sold, or leased, or proposed to be used, sold or leased, by the trustee,

11   the Court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is

12   necessary to provide adequate protection of such interest."

13   **A.**      **The Meaning of Adequate Protection**

14   Adequate protection is defined in 11 U.S.C. § 361 as follows:

15   When adequate protection is required under Section 362, 363, or 364 of this title,
     of an interest of an entity in property, such adequate protection may be provided
16   by - - (1) requiring the trustee to make a cash payment or periodic cash payments
     to such entity, to the extent that the stay under Section 362 of this title, use sale, or
17   lease under Section 363 of this title, or any grant of a lien under Section 364 of
     this title results in a decrease in the value of such entity's interest in such property;
18   (2) Providing to such entity an additional or replacement lien to the extent that
     such stay, use, sale, lease or grant results in a decrease in the value of such entity's
19   interest in such property; or (3) Granting such other relief, other than entitling
     such entity to compensation allowable under Section 503(b)(1) of this title as an
20   administrative expense, as will result in the realization of such entity of the
     indubitable equivalent of such entities interest in such property.
21

22   In many cases the existence of equity above the secured party's interest ("equity

23   cushion") may provide adequate protection *In re Dunes Casino Hotel*, (Bankr. D.N.J. 1986) 69

24   B.R. 784.  Whether an equity cushion provides adequate protection to a creditor is determined

25   on a case-by-case basis rather than by mechanical application of a formula.  *In re Kost*, (Bankr.

26   D.Wyo. 1989) 102 B.R. 829, 831.

27   In *In re Mellor* (9th Cir. 1984) 734 F.2d 1396, the Court in discussing the meaning of

28

1  "adequate protection" stated as follows:

2

3      "While the term "adequate protection" is not defined in the Code, 11 U.S.C. §361
       sets forth three non-exclusive examples of what may constitute adequate protection:
       1) periodic cash payments equivalent to decrease in value, 2) an additional or
4      replacement lien on other property, or 3) other relief that provides the indubitable
       equivalent (citation omitted)." *Id* at 1400.

5      The Court went on to discuss the existence of an equity cushion as a method of adequate

6  protection stating:

7

8      "Although the existence of an equity cushion as a method of adequate protection is
       not specifically mentioned in section 361, it is the classic form of protection for a
9      secured debt justifying the restraining of lien enforcement by a bankruptcy court
       (citation omitted). In fact, it has been held that the existence of an equity cushion,
10     standing alone, can provide adequate protection." *Id* at 1400.

11     In Footnote (e), the court defined equity cushion as the value in the property, above the

12 amount owed to the creditor with a secured claim that will shield that interest from loss due to

13 any decrease in the value of the property during time the automatic stay remains in effect. *Id.* at

14 1400; *see also*, *In re Roane*, (Bankr. E.D.Pa. 1981) 8 B.R. 997, 1000, *aff'd.*, 14 B.R. 542 (Bankr.

15 E.D. Pa. 1981).

16     As set forth above, since WFB and Wilshire may have a perfected lien upon all of the

17 cash, accounts receivables, inventory, equipment, and other items, which includes all of the cash

18 presently held or which will in the future come into the Debtor's possession, the Debtor

19 therefore respectfully requests approval of this Motion for Interim use of Cash Collateral. The

20 Budget attached hereto as **Exhibit "A"** shows that the Debtor is able to preserve the value of

21 the Cash Collateral, maintain business operations and make adequate protection payments to

22 WFB and Wilshire. The Debtor's ability to move toward confirmation of a plan in this case is

23 directly contingent upon approval of use of Cash Collateral at this time.

24 **B.     The Preservation and Enhancement of the Collateral Resulting from the Debtor's**

25 **ongoing Operations Affords Adequate Protection**.

26     In *McCombs Properties VI, Ltd. v. First Texas Savings Association* (*In re McCombs*

27 *Properties, VI, Ltd.*), 88 B.R. 261 (Bankr. C.D. Cal. 1988), the Bankruptcy Court applied the

28

1  *Timbers* decision in ruling that a secured creditor's interest in the cash and proceeds derived

2  from a debtor's operations was adequately protected where the value of the cash collateral was

3  not declining during the pendency of the bankruptcy case.  On the nature of the protection

4  required, Bankruptcy Judge Ryan noted:

5  > The analysis of the Supreme Court in *Timbers* is instructive here.  The phrase "interest in

6  > property" in §363(e) means the value of the collateral.  That is the interest that I am

7  > required to protect.  If that value is likely to diminish during the time of the use,

8  > adequate protection must be provided by the  debtor.  As the Supreme Court stated in

9  > *Timbers*, "thus, it is agreed if the apartment project in this case had been declining in

10 > value petitioner would have been entitled, under §362(d)(1) to cash payments or

11 > additional security in the amount of the decline, as §361 describes." *Id.* 484 U.S. at 198

12 > S.Ct. at 629, at 748.

13 *Id.*, at 266.

14     Similarly, in *Robert Neier v. Clark Oil & Refining Corp.* (*In re Apex Oil Company*), 85

15 B.R. 538 (Bankr. E.D. Mo. 1988), the Bankruptcy Court, relying exclusively on *Timbers*,

16 denied further  protection to a husband and wife holding over-secured claims because "[n]o

17 evidence was presented that the value of the [collateral] would diminish during the course of

18 this Chapter 11 proceeding." *See also, Bankers Life Insurance Co. v. Alyucan Interstate Corp.*

19 (*In re Alyucan Interstate Corp.*), 12 B.R. 803 (Bankr. D. Utah 1981); accord, *In re Hagendorfer*,

20 42 B.R. 13, 16 (Bankr. S.D. Ala. 1984), *aff'd sub nom. Hagendorfer v. Marlette*, 42 B.R. 17

21 (S.D. Ala. 1984)

22     As more fully set forth in the Budget, attached hereto as **Exhibit "A"**, the continued

23 operations of the Debtor over the next six months will result in net cash flow (after debt service,

24 miscellaneous expenses and operating capital set asides) averaging approximately $96,538.00

25 per month.  The Debtor's continued operation of its business will maintain and enhance the

26 value of the Collateral.

27     If the Motion is not granted, the Debtor will likely be forced to terminate its business

28

1    activities with potentially disastrous consequences both to WFB and Wilshire and to the other

2    creditors of this Estate.

3         It is well established that a Bankruptcy Court, where possible, should resolve issues

4    presented in favor of reorganization. *In re Hoffman*, 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985)

5    (relief from stay); *In re A&B Heating and Air Conditioning Inc.*, 48 B.R. 401, 403-04 (Bankr.

6    N.D. Fla. 1985) (injunction); *In re Heatron. Inc.*, 6 B.R. 493, 496 (Bankr. W.D Mo. 1980) (cash

7    collateral motion).  As the *Heatron* court stated in granting a debtor's motion to use cash

8    collateral:

9         At the beginning of the reorganization process, the Court must work with less evidence

10         than might be desirable and should resolve issues in favor of the reorganization, where

11         the evidence is conflicting.

12    Id., at 496.

13         In *MBank Dallas, N.A.v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1397-98 (10th Cir.

14    1987), the court summarized the foregoing principle as follows:

15

16         Because the ultimate benefit to be achieved by a successful
     reorganization inures to all the creditors of the estate, a fair

     opportunity must be given to the Debtors to achieve that end.  Thus,

17         while interests of the secured creditor . . . are of concern to the court,
     the interests of all other creditors also have bearing upon the question

18         of whether use of cash collateral shall be permitted during the early
     stages of administration.

19

20         The first effort of the court must be to insure the value of the collateral will be

21    preserved.  Yet, prior to confirmation of a plan of reorganization, the test of that protection is

22    not by the same measurements applied to the treatment of a secured creditor in a proposed

23    plan. In order to encourage the Debtor's efforts in the formative period prior to the proposal of

24    a reorganization, the court must be flexible in applying the adequate protection standard.

25    *Id*. at 1397-98

26         Applying the foregoing, courts have frequently allowed a debtor to use cash collateral

27    in circumstances where such use would enhance or preserve the value of the collateral.  Thus,

28

1  for example, in *In re Stein*, 19 B.R. 458 (Bankr. E.D. Penn. 1982), the court allowed a debtor to

2  use cash collateral where the secured party was under-secured.  The court in *Stein* found that

3  the use of the cash collateral was necessary to the continued operations of the debtor and "the

4  creditor's secured position can only be enhanced by the continued operation of the [debtor's

5  business]." *Id*. at 460.  *See also In re Pine Lake Village Apartment Co.*, 16 B.R. 750 (Bankr.

6  S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to

7  enhance the value of real property and secured creditor's claim); *In re Karl A. Neise Inc.*, 16

8  B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by

9  lien in post-petition property acquired by debtor; debtor can use cash collateral "in the normal

10  course of their business").

11     The foregoing holdings follow necessarily from the more general principle that a

12  secured creditor is only entitled to adequate protection of the value of the collateral securing

13  the creditor's allowed secured claim.  See *Timbers*, *supra*, at 629-30.  Where, as in the present

14  case, the continuation of the debtor's business preserves, indeed enhances, the value of the

15  creditor's alleged collateral, the debtor's continued operations constitute adequate protection of

16  the secured creditor's interests in the collateral. See, *e.g.*, *In re Coody*, 59 B.R. 164, 167

17  (Bankr. M.D. Ga. 1986).

18     The Debtor's continued use of the Debtor's cash will ensure that the "going concern"

19  value of its assets is preserved, a value substantially greater than the value which would be

20  realized from a liquidation of those assets if the Debtor were forced to cease operations.

21                                  **IV.**

22                            **CONCLUSION**

23     Based on the above, Debtor respectfully requests that the Court enter an Interim Order

24  granting the Debtor's request for an order permitting the use of pre-petition case, post-petition

25  cash, inventory and income under the terms set forth herein from March 12, 2010 through

26  September; set a hearing date for consideration of a final order for Interim Use of Cash

27  Collateral for the Period March 12, 2010 through September, 2010 and granting such other and

28  further relief as the court may deem just and proper.

Dated: March 12, 2010                    CLARKSON, GORE & MARSELLA, APLC

                                         By    /S/ Scott C. Clarkson
                                               Scott C. Clarkson
                                               Eve A. Marsella
                                               Christine M. Fitzgerald
                                               [Proposed] Attorneys for ConnectTo
                                               Communications, Inc.,
                                               Debtor and Debtor in Possession

# DECLARATION OF ARAKSIYA NADJARIAN

I, Araksiya Nadjarian, declare as follows:

1. I am the CEO of ConnectTo Communications, Inc., (the "Debtor"). I have direct supervisory responsibilities over the financial affairs and operations of the Debtor. I have reviewed the appropriate books and records of the Debtor which are maintained and obtained in the ordinary course of business, and have personal knowledge of the matters set forth herein because of that review or because of direct personal knowledge. If called upon as a witness in this case, I would and could testify competently thereto.

2. On March 12, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter of the Bankruptcy Code. Under 11 U.S.C. §§ 1107 and 1108, the Debtor has remained in possession of all of its assets and continues to operate and manage its business as a debtor-in-possession during the pendency of the Chapter 11 case.

3. The Debtor previously filed a voluntary Chapter 11 bankruptcy petition on November 30, 2009, Case No.2:09-bk-43560-VZ. Due to the mis-begotten efforts of a non-bankruptcy practicing attorney, the earlier case was soon thereafter converted to a Chapter 7 on January 25, 2010, and was dismissed on March 12, 2010. That case was in shambles, and required a professional's hand in the adequate preparation and submission of proper schedules, the SOFA, the UST reports and various motions to effectuate a chapter 11 reorganization.

4. After the hearing date on the dismissal of the chapter 7 case, the Debtor obtained counsel with instructions to seek an out-of-court workout with AT&T, the Debtor's largest unsecured creditor and service provider. The new counsel sought out AT&T; however, AT&T instructed its counsel not to engage the Debtor in any efforts to work-out a settlement. Thus, upon the dismissal of the Chapter 7 case, the Debtor properly filed its chapter 11 petition.

5. The Debtor incorporated in the state of Nevada on May 19, 2004 and is registered to do business in the state of California.

6.   The Debtor is a telecommunications company and services approximately 20,000 customers by reselling local telecommunications service purchased in bulk from Pacific Bell Telephone Company, doing business as AT&T California, and from Verizon.  The Debtor also provides long distance and ISP services.  Approximately 80% of the Debtor's customers are low income.  The services the Debtor provides to its low income customers is significantly subsidized by the California Public Utilities Commission (PUC).  As a result of the failure of the CA PUC to timely provide the promised subsidies, the Debtor fell behind on its payment to AT&T.

7.   For its Motion for Use of Cash Collateral, the Debtor has presented to the Court and all interested parties projections of revenues and operating results for the next six months (the "Budget") (attached hereto as **Exhibit "A"**).  The Debtor also supplies its unaudited profit and loss statement for 2009 and January 2010 through March 2, 2010 (attached hereto as **Exhibit "B"**).

8.   The Budget, prepared by me, is based on historical results of 2009 to date. At the time of the filing of the case, the Debtor had approximately $14,060.73 cash on hand and accounts receivables of approximately $241,221.74.  These funds are encumbered by the two primary secured creditors of the Debtor, Wells Fargo Bank and Wilshire State Bank.

9.   In addition, another $938,000 is owed to the Debtor by the PUC for payment subsidies arising from 2008 (the "Open Implementation Claim") and 2009 "Reimbursement for Low Income Customers". These funds are also encumbered by the two primary secured creditors of the Debtor, Wells Fargo Bank and Wilshire State Bank.  Further, these PUC amounts are <u>not</u> included in the operational income budget provided, as they are unnecessary for the day-to-day operations of this Debtor at this time. These PCU funds, which are expected to be paid throughout 2010, will be the foundation for the Plan of Reorganization of the Debtor.

10.  The Budget indicates that the Debtor's estimated income for the remainder of March 2010 is $174,170.00, $317,170.00 for April, $323,170.00 for May, $329,170.00 for

June, $364,170.00 for July, $370,170.00 for August, and $376,170.00 for September. After all proposed paid expenses, for March, 2010, the Debtor will have approximately $16,027.58 cash on hand, $11,330.52 for April, $12,633.46 for May, $14,936.40 for June, $47,239.34 for July, $85,542.28 for August, and $129,845.22 for September. The Debtor anticipates continuing cash flow sufficient to meet all of its immediate post-petition ordinary and necessary operating expenses (including secured creditor payments to provide adequate assurance) during the next six months. The profit and loss statements demonstrate that the Budget is realistic and accurate.

11. I used the company's Profit and Loss Statements from May 2009 to October 2009, to project the anticipated sales for March 2010 through September 2010. The Debtor projects that its customer payments will continue to increase based on the historical increase of customer payments. Further, as the Debtor's business increases the Debtor's USAC reimbursement and CABS invoices will increase as well. Finally, the Debtor anticipates a reimbursement from the Public Utilities Commission around July of 2010 for claims submitted after March of 2010. This amount may vary as low as approximately $30,000.00 (as reflected in the budget) or as high as approximately $90,000.00.

12. I believe that as of the Petition Date, WFB is holder of a secured pre-petition claim against the Debtor in the amount of approximately $99,000.00 (hereinafter referred to as the "WFB Claim"). The Debtor further believes that WFB has a fully perfected security interest on all of the Debtor's personal property assets, intangibles, and receivables.

13. I believe that WFB's secured claim is based on based on (1) a credit facility between WFB and the Debtor in the amount of $127,100.00 which may be secured by one or more properly filed financing statement with the California Secretary of State, effective upon all of the identified cash, accounts receivables, inventory, equipment, and other personal property items (collectively referred to as the "Collateral" or "Cash Collateral").

14. I believe that as of the Petition Date, Wilshire State Bank ("Wilshire") may be the holder of a secured pre-petition claim against the Debtor in the amount of approximately

1   $688,000.00 (hereinafter referred to as the "Wilshire Claim"). The Debtor further believes

2   that Wilshire may have a fully perfected security interest on all of the Debtor's personal

3   property assets, intangibles, and accounts receivables.

4       15. I believe that Wilshire's secured claim is based on based on credit facility between

5   Wilshire and the Debtor in the amount of $800,000.00 which may be secured by one or

6   more properly filed financing statement with the California Secretary of State, effective

7   upon all of the identified cash, accounts receivables, inventory, equipment, and other

8   personal property items (collectively referred to as the "Collateral" or "Cash Collateral")

9       I declare under penalty of perjury under the laws of the United States of America that

10  the above is true and correct and that this Declaration was executed on March 12, 2010 at Los

11  Angeles County, California.

12          /S/Araksiya Nadjarian
            Araksiya Nadjarian

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

MONTHLY CASH FLOW PROJECTION

| | 3/15/2010 | 04/01/10 | 05/01/10 | 06/01/10 | 07/01/10 | 08/01/10 | 09/01/10 | NOTES | Usage Based |
|---|---|---|---|---|---|---|---|---|---|
| **1. CASH ON HAND** | | | | | | | | | |
| (Beginning of month) | 14,060.73 | 16,027.58 | 11,330.52 | 12,633.46 | 14,936.40 | 47,239.34 | 85,542.28 | 1 | |
| **2. CASH RECEIPTS** | | | | | | | | | |
| (a) Anticipated Customer Payments | 124,000.00 | 255,000.00 | 258,000.00 | 261,000.00 | 264,000.00 | 268,000.00 | 272,000.00 | 2 | |
| (b) Receivables received post petition | 170.00 | 170.00 | 170.00 | 170.00 | 170.00 | 170.00 | 170.00 | 3 | |
| (c) USAC | 45,000.00 | 45,000.00 | 47,000.00 | 49,000.00 | 50,000.00 | 51,000.00 | 52,000.00 | 4 | |
| (d) CABS | 5,000.00 | 17,000.00 | 18,000.00 | 19,000.00 | 20,000.00 | 21,000.00 | 22,000.00 | 5 | |
| (e) Loan or Other Cash Injection | | | | | 30,000.00 | 30,000.00 | 30,000.00 | 6 | |
| **3. TOTAL CASH RECEIPTS** | | | | | | | | | |
| [2a + 2b + 2c + 2d + 2e = 3] | 174,170.00 | 317,170.00 | 323,170.00 | 329,170.00 | 364,170.00 | 370,170.00 | 376,170.00 | | |
| **4. TOTAL CASH AVAILABLE** | | | | | | | | | |
| [Before cash out] (1 + 3) | 188,230.73 | 333,197.58 | 334,500.52 | 341,803.46 | 379,106.40 | 417,409.34 | 461,712.28 | | |
| **5. CASH PAID OUT** | | | | | | | | | |
| (a) Office Rent | - | 4,188.84 | 4,188.84 | 4,188.84 | 4,188.84 | 4,188.84 | 4,188.84 | 7 | |
| (b) Payroll | 18,802.47 | 37,604.93 | 37,604.93 | 37,604.93 | 37,604.93 | 37,604.93 | 37,604.93 | | |
| (c) Payroll Processing | 135.00 | 135.00 | 135.00 | 135.00 | 135.00 | 135.00 | 135.00 | | |
| (d) Blue Cross | - | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 8 | * |
| (e) Bank Fees | 857.60 | 1,715.20 | 1,715.20 | 1,715.20 | 1,715.20 | 1,715.20 | 1,715.20 | | |
| (f) Utilities | - | 1,125.17 | 1,125.17 | 1,125.17 | 1,125.17 | 1,125.17 | 1,125.17 | 9 | |
| (g) Utility Deposit | 1,125.17 | | | | | | | | |
| (h) Office Supplies | 750.00 | 1,300.00 | 1,300.00 | 1,300.00 | 1,300.00 | 1,300.00 | 1,300.00 | 10 | |
| (h) Billing | 8,252.39 | 8,252.39 | 8,252.39 | 8,252.39 | 8,252.39 | 8,252.39 | 8,252.39 | 11 | * |
| (i) Telecom Professionals | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12 | |
| (j) Sprint | 1,174.39 | 1,174.39 | 1,174.39 | 1,174.39 | 1,174.39 | 1,174.39 | 1,174.39 | 13 | |
| (k) Internet - | 4,270.70 | 4,270.70 | 4,270.70 | 4,270.70 | 4,270.70 | 4,270.70 | 4,270.70 | 14 | * |
| (l) Hi-Tech Gateway | - | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | | |
| (m) US Collo | 3,150.00 | 3,150.00 | 3,150.00 | 3,150.00 | 3,150.00 | 3,150.00 | 3,150.00 | | |
| (n) Telecom Services | - | 7,922.00 | 7,922.00 | 7,922.00 | 7,922.00 | 7,922.00 | 7,922.00 | | |
| (o) Tax Escrow | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 15 | |
| (p) International Termination | 55,000.00 | 70,000.00 | 70,000.00 | 75,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 16 | |
| (q) Verizon | - | 2,622.14 | 2,622.14 | 2,622.14 | 2,622.14 | 2,622.14 | 2,622.14 | 17 | * |
| (r) AT&T | 40,235.43 | 120,706.30 | 120,706.30 | 120,706.30 | 120,706.30 | 120,706.30 | 120,706.30 | 18 | * |
| (s) Landmark Lease | 22,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 19 | |
| (t) Miscellaneous Expense | 750.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 20 | |
| (u) Subtotal | 166,003.15 | 315,667.06 | 315,667.06 | 320,667.06 | 325,667.06 | 325,667.06 | 325,667.06 | | |
| **LEGAL AND ACCOUNTING FEES** | | | | | | | | | |
| (v) Legal Fees | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | | |
| (w) Accounting Services | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 21 | |
| **PAYMENTS TO SECURED CREDITORS** | | | | | | | | | |
| (x) Wilshire State Bank | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 22 | |
| (y) Wells Fargo Bank | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 23 | |
| **6. TOTAL CASH PAID OUT** | | | | | | | | | |
| [Total 5a thru 5y] | 172,203.15 | 321,867.06 | 321,867.06 | 326,867.06 | 331,867.06 | 331,867.06 | 331,867.06 | | |
| **7. CASH POSITION** | | | | | | | | | |
| [End of month] (4 minus 6) | 16,027.58 | 11,330.52 | 12,633.46 | 14,936.40 | 47,239.34 | 85,542.28 | 129,845.22 | | |

ConnectTo Communications, Inc.
Case No.: 2:10-bk-19227-VZ
Notes for Budget

\* Expenses that are usage may increase or decrease significantly depending on the Debtor's business.

1. The current cash on hand is as of March 12, 2010.  This does not reflect employee payments in approximately $24,800.65 and a deposit of approximately $19,000.00 from customer payments.
2. These amounts are estimates based on the Debtor's previous customers payments
3. These amounts are estimates, the Debtor anticipates on receiving approximately $170.00/month on outstanding accounts receivable.
4. These amounts are estimates for the Federal Low Income Reimbursement, and are based on the Debtor's anticipated number of customers.  The Debtor anticipates that the number should increase approximately $1,000.00 every month.
5. These amounts are estimates for Wholesale Income.  This number is based on costumer use and the Debtor's anticipates the number to increase proportionally with the number of costumers.
6. This amount is an estimate of the anticipated CA Low Income Reimbursement from the Public Utilities Commission for claims submitted after March 2010.  The amount varies from $30,000 to $90,000.
7. The payroll includes all amounts for employees and insiders, and payroll and workers compensation insurance.
8. Blue Cross provides medical insurance for the Debtor's employees.
9. These amounts represent estimated expenses for the following utilities: Gas ($48.17/month) and Water and Power ($1,077.00/month).  These amounts represent an average of past monthly expenses.
10. These amounts are estimates miscellaneous office supplies (i.e. paper, envelopes, stamps, etc.)
11. These amounts represent estimated expenses for the following: Billsoft Billing Service ($2,526.16/month); Emdeon Bill Printing Service ($4,726.23/month); and Ethos ($1,000.00/month).
12. Telecom Professionals provides administrative and regulatory support for the Debtor.
13. These amounts represent estimated expenses for Sprint NEXTEL Techs ($542.56/month); and Sprint PCS ($631.83/month).  The Sprint services provide wireless service to the Debtor.
14. These amounts represent estimated expenses for Time Warner ($1,722.02/month) and Sonic ($2,548.68/month).
15. These funds are placed into an account for Telecom Taxes and then distributed to the appropriated governmental agency or unit.
16. International Termination provides long distance termination service for the Debtor.
17. These amounts represent estimated expenses for the following: Verizon ($1,718.93/month); Verizon Local ($138.21/month); and Verizon Internet ($765.00/month).

18. These amounts represent estimated expenses for the following: AT&T U-Verse Interest ($86.96/month); DSL Line Charge ($9,582.91/month); DSL ($10,300.00/month); Collocation ($2,917.93/month); LWC ($79,597.17/month); and UNB ($18,221.33/month).

19. The Debtor has a lease with Landmark for Zhone Technologies equipment.  The payment for March 2010 in the amount of $22,500.00 for 3 months of past due payments.  The payments for April 2010 through September 2010, in the amount of $7,500.00 represent monthly payments on an ongoing basis.

20. The Debtor anticipates that it may need to employ and incur fees for accounting services.

21. This category is for anticipated miscellaneous expenses that may arise during the ordinary operation of the Debtor's business.

22. This is an estimate of monthly interest payments owed to Wilshire State Bank based on the Debtor's last interest payment of $1,777.29/month and may be subject to change

23. This is an estimate of monthly interest payments owed to Wells Fargo Bank based on the Debtor's last interest payment of $407.37/month and may be subject to change.

# EXHIBIT B

11:32 AM

03/09/10

Accrual Basis

# ConnectTo Communications, Inc.
## Profit & Loss
### January through November 2009

| | Jan - Nov 09 |
|---|---:|
| **Ordinary Income/Expense** | |
|   **Income** | |
|     **Fees** | |
|       discount | 80.00 |
|     **Total Fees** | 80.00 |
|     Hardware Sales | 4,889.08 |
|     low income -reimb. expense | 1,453,826.23 |
|     Services | 1,135.00 |
|     **Telecommunication Income** | |
|       Internet Income | 5,937.67 |
|       Residential LD | 2,778,776.82 |
|       Telecom Consulting Income | 30.56 |
|       **Telecom Wholesale Income** | |
|         CABS Billing | 451,232.81 |
|       **Total Telecom Wholesale Income** | 451,232.81 |
|       Telecommunication Income - Other | 78,877.72 |
|     **Total Telecommunication Income** | 3,314,855.58 |
|   **Total Income** | 4,774,785.89 |
|   **Cost of Goods Sold** | |
|     Long Distance Expenses | 503,674.12 |
|     **Internet** | |
|       DSL charges | 193,298.43 |
|       Internet - Other | 1,176.77 |
|     **Total Internet** | 194,475.20 |
|     Hardware Costs | 341.65 |
|     Calling Cards Cost | 253.68 |
|     Dialup Costs | 1,100.00 |
|     **LOCAL SERVICE EXPENSE** | |
|       CABS-OUT/PAID | 7.80 |
|       LOCAL FACILITIES BASED | 13,419.81 |
|       LOCAL SERVICE EXPENSE - Other | 1,906,707.98 |
|     **Total LOCAL SERVICE EXPENSE** | 1,920,135.59 |
|     **Termination Costs-HANDBACK COST** | 546,084.76 |
|   **Total COGS** | 3,166,065.00 |
| **Gross Profit** | 1,608,720.89 |
|   **Expense** | |
|     Telecom Wholesale Expenses | 4,110.39 |
|     Advertising | 27,140.14 |
|     Alarm | 500.41 |
|     Armenia Office Expense | 366,100.00 |
|     Automobile Expense | 28,907.96 |
|     Bank Service Charges | 24,463.47 |
|     Contributions | 0.00 |
|     Equipment Rental | 41,238.62 |
|     Expense Reimbursement | 104,016.64 |
|     Hardware Expense | 40,260.07 |
|     **Health Benefits** | |
|       Health Insurance | 27,268.33 |
|       Health Benefits - Other | 8,724.00 |
|     **Total Health Benefits** | 35,992.33 |
|     **Insurance** | |
|       Liability Insurance | 5,610.00 |
|       Work Comp | 2,995.06 |
|       Insurance - Other | 1,094.80 |
|     **Total Insurance** | 9,699.86 |

11:32 AM

03/09/10

Accrual Basis

# ConnectTo Communications, Inc.
## Profit & Loss
### January through November 2009

|  | Jan - Nov 09 |
|---|---|
| **Interest Expense** |  |
|     Finance Charge | 11,356.54 |
|     Loan Interest | 18,949.98 |
|     Interest Expense - Other | 2,233.17 |
| **Total Interest Expense** | 32,539.69 |
|  |  |
| **late fee** | 9,955.32 |
| **Licenses and Permits** | 1,935.44 |
| **Membership** |  |
|     Dues and Subscriptions | 1,584.94 |
|     Membership - Other | 469.73 |
| **Total Membership** | 2,054.67 |
|  |  |
| **Miscellaneous** | 8,905.27 |
| **Outside consultants** | 10,400.00 |
| **Outside Services** | 27,419.50 |
| **Payroll Expenses** | 252,912.80 |
| **Postage and Delivery** |  |
|     handling fee | 258.00 |
|     Postage and Delivery - Other | 66,663.08 |
| **Total Postage and Delivery** | 66,921.08 |
|  |  |
| **Printing and Reproduction** | 542.78 |
| **Professional Fees** |  |
|     Accounting | 1,750.00 |
|     Legal Fees | 17,869.81 |
|     Professional Fees - Other | 12,858.31 |
| **Total Professional Fees** | 32,478.12 |
|  |  |
| **Rent** |  |
|     Office Supplies |  |
|         Office Expense | 41.70 |
|         Office Supplies - Other | 997.52 |
|     **Total Office Supplies** | 1,039.22 |
|     Rent - Other | 62,373.70 |
| **Total Rent** | 63,412.92 |
|  |  |
| **Repairs** |  |
|     Repairs and Maintenance | 7,772.56 |
|     Repairs - Other | 250.00 |
| **Total Repairs** | 8,022.56 |
|  |  |
| **State government fee** | 4,341.34 |
| **Taxes** |  |
|     Federal Excise Tax Expense | 1,500.00 |
|     Federal | 34,214.56 |
|     Local | 8,287.14 |
|     Property | 7,379.70 |
|     State | 5,309.57 |
|     Taxes - Other | 40,381.51 |
| **Total Taxes** | 97,072.48 |
|  |  |
| **Telecom Consulting Expense** | 15,366.61 |
| **Telephone & Internet OFFICE TEL** |  |
|     Internet | -13.21 |
|     Telephone & Internet OFFICE TEL - Other | 29,152.20 |
| **Total Telephone & Internet OFFICE TEL** | 29,138.99 |
|  |  |
| **Travel & Ent** |  |
|     Meals | 4,433.91 |
| **Total Travel & Ent** | 4,433.91 |

11:32 AM

03/09/10

Accrual Basis

# ConnectTo Communications, Inc.
## Profit & Loss
### January through November 2009

|  | Jan - Nov 09 |
|---|---|
| Utilities |  |
| Gas commodity charges | 129.42 |
| water and power | 11,204.35 |
| portable water | 363.00 |
| **Total Utilities** | 11,696.77 |
| **Total Expense** | 1,361,980.14 |
| **Net Ordinary Income** | 246,740.75 |
| Other Income/Expense |  |
| Other Income |  |
| Property Damage reimbursement | 12,198.84 |
| Other Income | 370.06 |
| **Total Other Income** | 12,568.90 |
| Other Expense |  |
| Other Expenses | 680.64 |
| **Total Other Expense** | 680.64 |
| **Net Other Income** | 11,888.26 |
| **Net Income** | **258,629.01** |

| | |
|---|---|
| In re:<br><br>ConnectTo Communications, Inc.<br><br>Debtor(s) and<br>Debtors in Possession | CHAPTER  11<br><br>CASE NUMBER: 2:10-bk-19227-VZ |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

3424 Carson Street,  Suite 350, Torrance, CA 90503

A true and correct copy of the foregoing document described **DEBTOR'S EMERGENCY MOTION FOR APPROVAL FOR INTERIM USE OF CASH COLLATERAL [FOR THE PERIOD MARCH 12, 2010 THROUGH SEPTEMBER 30, 2010]; DECLARATION OF ARAKSIYA NADJARIAN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐                                                                    Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On **March 12, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**See attached service list**

☒                                                                    Service information continued on attached page**.**

**SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 12, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**See attached service list**

☒     Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| March 22, 2010 | Brenda L. Campos | _(signature)_ |
| _Date_ | _Type Name_ | _Signature_ |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:                                   | CHAPTER 11                     |
|                                          |                                |
| ConnectTo Communications, Inc.           | CASE NUMBER: 2:10-bk-19227-VZ  |
|                           Debtor(s) and  |                                |
|                     Debtors in Possession|                                |

## SERVICE LIST

### Served Via Fed Ex

**U.S. Trustee**
Dare Law
725 S. Figueroa St. Suite 2600
Los Angeles, CA 90017

**Judge**
Vincent P. Zurzolo
255 E. Temple St. Suite 1360
Los Angeles, CA 90012

## TOP 20 CREDITORS

### Served via Fax or E-Mail
AT&T
c/o Pillsbury, Winthrop, Shaw, Pittman, LLP
Mark Houle  mark.houle@pillsburylaw.com
David Tabibian  david.tabibian@pillsburylaw.com
Dave Egan  de5269@att.com

Hi-Tech Gateway
Attn: Armen
(208)275-1818

Global Crossing Tel Cable
Attn: David Gagliardi
(585) 324-4054

Cedar Point Communications, Inc
Attn: Joe Santiago
(603)898-3090

HCI, Inc.
Mirau, Edwards, Cannon, Lewin & Tooke
William Tooke, Esq.  wtooke@mechlaw.com

U.S.Colo, LLC
Rick Fisher  rick@uscolo.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                  **F 9013-3.1**

| In re:<br><br>ConnectTo Communications, Inc.<br><br>Debtor(s) and<br>Debtors in Possession | CHAPTER 11<br><br>CASE NUMBER: 2:10-bk-19227-VZ |
|---|---|

Equant LLC
+7 495 620 9484  (Russia)

Solix
Thomas Carroll  tcarroll@solixinc.com

Emdeon Buisness Services
Bill Roberts broberts@emdeon.com

Ethos
Josh Ploude  jp@ethoscg.net

Verisign
Jackie Bauer
(360) 493-6184

East West Bank
Doug Krause Agent for Service of Process
Doug.krause@eastwestbank.com

Verizon Business
Natalie Bannister    Natalie.bannister@verizonbusiness.com

Verizon Business
Stephanie Fowler- Dunn
c-stephanie.fowler@verizonbusiness.com

Pac-West
Pauline Wickstrom  pwickstr@pacwest.com

Billsoft Services
Joe Wolf    jwolf@billsoft.com

Rocket Internetworking
Brian Hinds
(562) 432-6096

MM Internet
Brian Hinds
(562) 432-6096

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                     **F 9013-3.1**

| In re:                                          | CHAPTER 11                      |
|                                                 |                                 |
| ConnectTo Communications, Inc.                  | CASE NUMBER: 2:10-bk-19227-VZ   |
|                                    Debtor(s) and|                                 |
|                              Debtors in Possession|                               |

Check-O-Matic
(800) 466-1395

Telepacific Communications
(213) 666-9680

MPower Communicatios
Barry Lear  blear@telepacific.com

## SECURED CREDITORS WITH AN INTEREST IN CASH COLLATERAL

### Served via Fax or E-mail

Wells Fargo Bank, N.A.
c/o Ed Miller
(951) 296-1776
emiller@dfflaw.com

Wilshire State Bank
Anil Sah
(213) 427-2062
anilsah@wilshirebank.com

John Choi, Esq. for Wilshire Bank
213-384-4888
johnChoi@kpcylaw.com

## SECURED CREDITOR

Landmark Financial
c/o Irwin M. Wittlin
(818) 501-3800
iwittlin@hemar-rousso.com

National City Commercial Capital
c/o Steven Glass
sglass@glassgoldberg.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                            F 9013-3.1

| | |
|---|---|
| In re:<br><br>ConnectTo Communications, Inc.<br><br>Debtor(s) and<br>Debtors in Possession | CHAPTER 11<br><br>CASE NUMBER: 2:10-bk-19227-VZ |

## OTHER CREDITORS

Franchise Tax Board
916-845-9799

Local IRS Office
213-627-1528

LA County Tax Collector
213-633-5004

State of California Employment Development Dept
916-464-3504

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 F 9013-3.1